**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――

**No. 24-1076**

―――――――

COLBY WILLIAM CROSBY, as the Personal Representative of the Estate of William Jerry Crosby,

Plaintiff – Appellant,

v.

COLLETON COUNTY SHERIFF'S OFFICE; SHERIFF GUERRY BUDDY HILL, in his official capacity; JACOB SCOTT, individually,

Defendants – Appellees.

―――――――

Appeal from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:22-cv-03897-RMG)

―――――――

Argued: May 5, 2026                                      Decided: July 31, 2026

―――――――

Before RUSHING and HEYTENS, Circuit Judges, and FLOYD, Senior Circuit Judge.

―――――――

Affirmed by published opinion. Judge Rushing wrote the majority opinion, in which Judge Heytens joined. Senior Judge Floyd wrote an opinion dissenting in part.

―――――――

**ARGUED:** Nicholas Andrew Charles, MCLEOD LAW GROUP LLC, Columbia, South Carolina, for Appellant. E. Mitchell Griffith, GRIFFITH, FREEMAN & LIIPFERT, LLC, Beaufort, South Carolina, for Appellees. **ON BRIEF:** W. Mullins McLeod, Jr., MCLEOD LAW GROUP, LLC, Charleston, South Carolina, for Appellant. Kelly D. Dean, GRIFFITH, FREEMAN & LIIPFERT, LLC, Beaufort, South Carolina, for Appellees.

―――――――

RUSHING, Circuit Judge:

Jerry Crosby's wife called 911 to request a welfare check on her husband because he had threatened to harm himself. Tragically, Crosby pulled a gun on the responding officer, who then fired on Crosby, killing him. Crosby's estate sued the officer, the sheriff, and the sheriff's office, alleging violations of Crosby's Fourth Amendment rights. The district court granted summary judgment for Defendants on those claims, and Crosby's estate appealed. We affirm.

## I.

At 7:44 p.m. on May 1, 2022, Donna Crosby called 911 requesting a welfare check on her husband, Jerry Crosby. Relaying Mrs. Crosby's request, the 911 dispatcher issued the following notes via the computer-assisted dispatch system:

> CLR IS REQ A WELFARE CHECK ON HER HUSBAND
>
> SHE ADV AROUND 5-530 HE SAID HE WOULD HARM HIMMSELF [sic]
>
> CLR ADV HE HAS SAID THIS BEFORE IN THE PAST
>
> CLR ADV HE HASNT BEEN HIMSELF LATELY
>
> RESD IS LARGE 2 STORY RIVER HOUSE BROWN IN COLOR W CREME [sic] TRIM
>
> SUSP DRIVES A WHITE GMC TRUCK
>
> SHE ADV THE NEIGHBOR ADDRESS IS 341 PERKINS PATH
>
> HIS HOUSE IS ON THE RIVER
>
> CLR ADV EARLIER TODAY HE LEFT TO GO TO THE RIVER

2

J.A. 358. Officer Jacob Scott of the Colleton County Sheriff's Office received this dispatch and responded to the call.[1]

Officer Scott's actions that evening were recorded by his body-worn camera. The footage shows Officer Scott arriving at Crosby's residence, a two-story riverfront house located at the end of a dirt road on the west bank of the Edisto River. A white GMC truck was parked in the yard in front of a carport. Officer Scott walked directly to a door on the south wall of the house and knocked. During the next minute and thirty-three seconds, he knocked on the same door twice more. Receiving no answer, Officer Scott approached a screen door on the same south wall and peered inside the screened porch, calling out, "Hello?" J.A. Digital Media (6:06–6:36). He did not see or hear anyone, but a dog could be heard barking inside the residence. Officer Scott then climbed an exterior staircase to a screen door leading into a second-floor screened porch that faced east toward the river. He knocked on the screen door and, receiving no response except the dog's barking, descended the stairs and returned to his patrol car.

After retrieving a flashlight from his vehicle and confirming that Crosby was not inside the white truck, Officer Scott approached the house again. He knocked on the door of the first-floor screened porch and again heard the barking dog. He then walked along the outside of the first-floor screened porch while shining the flashlight inside. Daylight was fading. Returning to the house's south wall, Officer Scott again ascended the exterior

---

[1] In his brief to this Court, Scott uses the title "Officer," so we do too.

staircase closest to the river and shined the flashlight into the second-floor screened porch and the house's south-facing windows.

Officer Scott then opened the screen door and entered the porch. He approached a glass door that separated the porch from the interior of the house and knocked twice. A light was coming from the second-floor hallway, and he shined his flashlight into the windows facing the porch. After about thirty seconds, he knocked again, this time with the bottom end of his flashlight. The dog continued barking. Officer Scott descended the exterior stairs and peered through a south-facing window on the first floor, which revealed an overhead light shining above a spiral staircase inside the home.

Having received no response to his repeated efforts to make contact with Crosby, Officer Scott returned to the first door that he had knocked on upon his arrival at the residence approximately ten minutes earlier. Finding the door unlocked, Officer Scott opened it and announced, "Sheriff's Office." J.A. Digital Media (14:04–14:23). He leaned into the room and scanned it with his flashlight. Seeing no one, he closed the door.

Officer Scott then entered another door in a similar fashion. He climbed an exterior staircase leading to a west-facing deck on the side of the house opposite the river. There, he knocked on two sets of sliding glass doors while shining his flashlight at the interior curtains. He then opened one sliding glass door and announced, "Sheriff's Office." J.A. Digital Media (14:59–15:14). He pushed aside the curtains to reveal an unoccupied bedroom and repeated, "Sheriff's Office," and then, "Mr. Crosby, Sheriff's Office," before sliding the door shut again. J.A. Digital Media (15:14–15:44). Moving to the other sliding glass door, Officer Scott knocked twice more, announced, "Sheriff's Office," and tugged

4

at the handle to discover the door was locked. J.A. Digital Media (15:44–16:08). After descending the stairs, he shined his flashlight into the glass door of an unoccupied first-floor bedroom under the west-facing deck.

Having still received no response from Crosby, Officer Scott returned to the first-floor screened porch facing the river. He announced, "Sheriff's Office" and entered the porch through an unlocked screen door. J.A. Digital Media (17:00–17:30). Officer Scott saw a cell phone on the floor. He approached a bar on the porch, shined his flashlight on an open notebook and a pill bottle, and said, "Shit." J.A. Digital Media (17:24–17:44). He then radioed, "Looks like I have a suicide note on the patio," and requested expedited animal control support, as the dog inside the house continued barking. J.A. Digital Media (17:44–18:25). By this time, another officer, Lindsay Cummings, had arrived on the scene, and Officer Scott told her, "I don't know, I think he's upstairs in the bedroom. I can see something in the bedroom, but I gotta do something with this dog." J.A. Digital Media (18:30–18:50). The door into the first floor of the house from the screened porch was open, and Officer Scott stood in the doorway of the house, scanning with his flashlight and whistling and calling to coax the dog downstairs. After approximately three minutes on the porch, Officer Scott exited.

Officer Scott then used the exterior staircase to return to the second-floor screened porch. From there, he entered the house through an unlocked glass door that opened into a living area. As he called the barking dog, Officer Scott crossed the living area toward a hallway. Flashlight in hand, Officer Scott proceeded down the hallway and announced,

5

"Sheriff's Office." J.A. Digital Media (20:53–21:10). Walking down the hallway, he saw a live round of ammunition on the floor.

From the bedroom at the end of the hallway, Crosby responded for the first time:

Crosby:     "What can I do for you?"

Scott:      "Where are you at, man?  This is the Sheriff's Office.
            Are you okay?"

J.A. Digital Media (21:07–21:18). As Officer Scott continued approaching Crosby's bedroom, he called out again:

Scott:      "What was that?  Are you okay?"

Crosby:     "I'm fine."

J.A. Digital Media (21:18–21:22). Having reached the doorway of Crosby's bedroom, Officer Scott shined his flashlight into the room and saw Crosby in bed underneath the fitted sheet. Crosby's speech was slurred and his face was red. The dialogue continued:

Scott:      "Someone called in about you."

Crosby:     "Well, get the hell out of my home."

Scott:      "Okay.  What's going on?"

Crosby:     "Get the hell out of my home."

Scott:      "I got to make sure you're okay.  Have you taken any pills or
            anything like that?"

Crosby:     "What do you want me to do?"

Scott:      "Can you come out and talk to me real quick?"

Crosby:     "Get the hell out of my home."

Scott:      "We got to check on you."

Crosby:     "Get out of my home."

6

| | |
|---|---|
| Scott: | "We have to check on you." |
| Crosby: | "Get out of my home." |
| Scott: | "Okay. We're here for health and welfare. All I got to do is check on you." |
| Crosby: | "Get out of my home." |
| Scott: | "Are you trying to hurt yourself?" |
| Crosby: | "Get out of my home." |
| Scott: | "I'm not going to leave this door. So, we just either got to just go outside and talk and we can just handle this." |

J.A. Digital Media (21:25–22:04).

Crosby then rose from his bed and walked toward Officer Scott as Crosby again said, "Get out of my home." J.A. Digital Media (22:04–22:06). Officer Scott stepped back into the hallway, saying, "Okay." J.A. Digital Media (22:06–22:09). Crosby leaned into a closet near the door and retrieved a rifle, as Officer Scott commanded:

| | |
|---|---|
| Scott: | "Don't! No! No! No! No! No! No! No! No! No! No! No! No! No! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't!" |

J.A. Digital Media (22:10–22:13). While shouting these commands, Officer Scott raised his firearm and backed down the hallway. Crosby picked up the rifle and began raising it with two hands as he stepped toward Officer Scott. Still backing down the hallway, Officer Scott fired four rounds at Crosby and retreated into the living area. Crosby dropped the rifle and collapsed onto the bed. He later died from his injuries.[2]

---

[2] A revolver was later found in Crosby's pocket.

The personal representative of Crosby's estate sued the Colleton County Sheriff's Office, Sheriff Guerry Buddy Hill, and Officer Scott in South Carolina state court. Against Officer Scott, Plaintiff asserted Fourth Amendment claims for unlawful entry (Count I) and excessive force (Count II), as well as state-law claims. Against the Sheriff's Office and Sheriff Hill, Plaintiff asserted a claim for failure to train under 42 U.S.C. § 1983 (Count VI) and state-law claims. Defendants removed the case to federal court and, after discovery, moved for summary judgment on all claims. Plaintiff cross-moved for summary judgment on the unlawful entry claim.

Ruling on the motions, the district court concluded that Officer Scott did not violate Crosby's Fourth Amendment rights because his entries and use of deadly force were objectively reasonable. The court also held that Officer Scott was entitled to qualified immunity on both Fourth Amendment claims. And having found no constitutional violation, the court determined that Plaintiff could not establish municipal liability. The district court thus granted summary judgment in favor of Defendants on all the federal claims and denied Plaintiff's cross-motion for summary judgment. The court remanded the state-law claims to state court; that ruling is not before us. Plaintiff timely appealed the district court's rulings on the three federal claims.

## II.

"Whether a party is entitled to summary judgment is a question of law we review de novo," applying the same standard as the district court. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, "there is no genuine dispute as to any

8

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019).

## III.

We begin with the Fourth Amendment claims against Officer Scott. The district court determined that no reasonable jury could find that Officer Scott violated Crosby's Fourth Amendment rights by entering his home or by using deadly force against him. After close review, we agree on both counts.

## A.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The "'core'" of this guarantee is the right to "'be free from unreasonable governmental intrusion'" in one's own home. *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). For intrusions into a person's home, "reasonableness" typically means having a warrant. *Case v. Montana*, 146 S. Ct. 500, 505 (2026). But "the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). One such exception is "the need to assist persons who are seriously injured or threatened with such injury." *Id.* "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.*; *see Mincey v. Arizona*, 437 U.S. 385, 392 (1978).

This so-called "emergency aid exception" does not require "ironclad proof of a likely serious, life-threatening injury" before officers may enter a home; rather, "[i]t

9

requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47, 49 (2009) (per curiam) (internal quotation marks, citation, and brackets omitted). As the Supreme Court reiterated earlier this year, an officer may enter a home without a warrant if he has "'an objectively reasonable basis for believing' that an occupant is seriously injured or imminently threatened with such harm." *Case*, 146 S. Ct. at 507 (quoting *Brigham City*, 547 U.S. at 400). We evaluate the objective reasonableness of an officer's conduct "by looking at the 'totality of the circumstances.'" *Id.* at 508 (quoting *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025)).

Decisions applying the emergency aid exception have presented widely varying circumstances. For example, in *Brigham City*, officers responding to a complaint about a loud nighttime party heard a tumultuous altercation and looked through a window to see a fistfight unfolding in the kitchen. 547 U.S. at 406. The Supreme Court found it "plainly reasonable" for the officers to enter the house and quell the violence. *Id.* In *Case*, officers responding to a 911 call learned that Case had called his ex-girlfriend and, in an apparently inebriated state, had threatened to kill himself, spoke of preparing a suicide note, and possibly cocked or even shot a gun. 146 S. Ct. at 503–504. Looking through the windows of Case's house, officers saw empty beer cans, an empty handgun holster, and a notepad with writing on it. They knocked on the doors and yelled into an open window but got no response. The Supreme Court "read[ily]" concluded that the officers had "an objectively reasonable basis for believing that their intervention was needed to prevent serious harm." *Id.* at 508 (internal quotation marks omitted). And in *United States v. Taylor*, we found it

10

objectively reasonable for an officer to enter a home when a four-year-old child had wandered away from it and yelling into the home from the doorway produced no response. 624 F.3d 626, 632 (4th Cir. 2010).  We concluded that "both the self-evident danger that the abandoned child posed to herself and the inference of danger to her caretaker made it reasonable to conclude that it was necessary to make a brief entry to find someone inside the home—and to do so promptly." *Id.* at 632–633; *see also United States v. Dean*, 243 Fed. App. 780, 782 (4th Cir. 2007) (odor of gasoline fumes and visible open gas can in a wood-framed apartment building justified warrantless entry).  In each situation, warrantless entry was constitutional because the officers possessed "an objectively reasonable basis for believing that an occupant face[d] serious danger."  *Case*, 146 S. Ct. at 505 (internal quotation marks omitted).

With this standard firmly in mind, we turn to the circumstances when Officer Scott entered Crosby's home.  Plaintiff contends that Officer Scott entered the house four times before finding the suicide note and pill bottle, which led to the fifth and most intrusive entry into the second-floor living area and down the hallway.  First, he entered the second-floor screened porch to knock on the glass door into the house.  Second and third, he opened exterior doors and, leaning into the doorway, shined his flashlight into previously obscured portions of the house.  And fourth, he entered the first-floor screened porch where a visual scan of the room revealed the suicide note and pill bottle.  Like the district court, we will assume that each of these entries is subject to Fourth Amendment scrutiny.  And like the district court, we conclude that, even before Officer Scott found the suicide note and pill bottle, the emergency aid exception justified his warrantless entries.

11

Considering the totality of the circumstances, Officer Scott had an objectively reasonable basis for believing that his entry "was needed to prevent serious harm." *Id.* at 508. Upon arriving at the residence, Officer Scott knew that Crosby's wife had called 911 to request a welfare check on her husband, who had been acting strangely—an assessment an officer could presume she was well-positioned to make. Officer Scott was aware that Crosby had threatened to harm himself earlier that evening; had threatened to harm himself in the past; and had left to go to the river house, an isolated location. At the house, Officer Scott observed Crosby's white GMC truck parked outside and confirmed that Crosby was not in the truck. Officer Scott thus had reason to believe that Crosby was in the house and at high risk of harming himself. Yet Officer Scott received no response to his repeated knocking on three different doors over the course of approximately seven minutes (before his first entry). As he walked around the property, he saw a single light on inside the house but could not see Crosby. And no one made any effort to quiet the dog that was barking incessantly inside the house. The lack of response to Officer Scott or the barking dog gave Officer Scott additional reason to believe that exigent circumstances existed that required him to enter the residence to confirm Crosby's safety. If Crosby had already harmed himself, he could have been in need of immediate medical care. And if he had not already harmed himself, timely intervention could prevent him from doing so.

We further note that Officer Scott's actions inside the home during each entry were reasonable. During the first entry—into the second-floor screened porch—he proceeded directly to the glass door to the main house and knocked. For the second and third entries, he opened doors and announced himself, scanning rooms with his flashlight without

12

stepping into the house. During the fourth entry, into the first-floor screened porch, he scanned the room with his flashlight and saw the suicide note and pill bottle in plain view on the bar top. Only at that point did he make a more intrusive entry into the main house to find Crosby, who he reasonably believed was dead or dying inside.

Plaintiff protests that Officer Scott did not encounter a chaotic scene or visible signs of distress like those that existed in some other emergency aid cases. *See, e.g., Fisher*, 558 U.S. at 45–46 (officers found "a household in considerable chaos": a pickup truck with its front smashed, damaged fenceposts, and broken house windows; blood on the hood of the pickup, on clothes inside it, and on one of the doors to the house; and an individual inside the house screaming and throwing things); *Brigham City*, 547 U.S. at 400–401 (officers responded to a loud party, heard shouting, and observed "an altercation" in which a juvenile "swung a fist and struck one of the adults in the face," causing the adult to spit blood (internal quotation marks omitted)); *United States v. Bustamante-Martinez*, 697 Fed. App. 244, 245–246 (4th Cir. 2017) (per curiam) (officers observed that the suspect was intoxicated and holding a rifle, and they learned that he had been firing a gun, "had assaulted his wife, [had] threatened to kill himself, and [had] locked himself in a bedroom").

We reject Plaintiff's effort to impose a requirement of visible chaos or evident distress onto the emergency aid exception. As the Supreme Court recently reiterated, "[t]he objective reasonableness of an officer's conduct under *Brigham City*, as in other Fourth Amendment contexts, is evaluated by looking at the totality of the circumstances." *Case*, 146 S. Ct. at 508 (internal quotation marks omitted). Plaintiff's rule fails to account for

13

the full range of circumstances that could give rise to "'an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.'" *Id.* (quoting *Brigham City*, 547 U.S. at 400). "The role of a peace officer includes preventing violence," "not simply rendering first aid to casualties." *Brigham City*, 547 U.S. at 406. In circumstances where it is objectively reasonable to think that a suicidal individual "could kill [himself] at any moment," the "Fourth Amendment does not require officers to stand idly outside as the suicide takes place." *Caniglia*, 141 S. Ct. at 1604 (Kavanaugh, J., concurring).

Nor does Plaintiff advance his position by relying on our decisions in *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003), and *United States v. Moss*, 963 F.2d 673 (4th Cir. 1992), *as amended* (May 21, 1992), which both found warrantless entry was not justified on facts meaningfully different from those presented here. In *Bailey*, officers responding to a request for a welfare check spoke face-to-face with Bailey, who twice "denied any thoughts of suicide" and proceeded to eat his lunch and call a family member on the phone. 349 F.3d at 739–740. We concluded that "no exigent circumstances" justified the officers' subsequent second entry into Bailey's home, this time by force. *Id.* at 743. In *Moss*, an officer entered a cabin because he thought it was being illegally occupied; he "wanted to locate the owner of [an] illegally parked car"; and "he was concerned to identify the persons connected with the car, who he feared might be lost, injured, or dead in the mountains." 963 F.2d at 675. We rejected those justifications, finding "nothing about the circumstances then confronting [the officer] . . . that warranted any perception of an emergency requiring immediate entry to attend to them." *Id.* at 679.

14

The same cannot be said here. Officer Scott had credible information from Crosby's wife that Crosby intended to harm himself and had left for the river house. Officer Scott saw evidence that Crosby was present at the river house around eight o'clock that evening yet did not respond to the officer's repeated knocking or to the dog's incessant barking from inside the home. In these circumstances, Officer Scott had "'an objectively reasonable basis for believing' that his entry was direly needed to prevent or deal with serious harm," namely, Crosby's potential attempt to take his own life. *Case*, 146 S. Ct. at 507 (quoting *Brigham City*, 547 U.S. at 400). Officer Scott's decision to enter the home in an effort to make contact with Crosby and prevent that result was reasonable and, therefore, constitutional.

## B.

We turn next to Plaintiff's claim of excessive force. That claim is also "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "When *deadly* force is used," we apply "a more specific test for objective reasonableness." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). In such a case, we ask whether a "reasonable officer in that situation would have had 'probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others.'" *Id.* (quoting *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005)). This inquiry requires that we assess the "totality of the circumstances," which includes "the situation at the precise time of the shooting" as well as "facts and events leading up to the climactic moment." *Barnes*, 145 S. Ct. at 1356, 1358; *see also Tennessee v. Garner*, 471 U.S. 1, 9 (1985). At all times, our perspective must remain that of "a reasonable officer on

15

the scene" rather than "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This Court has consistently "discerned an objective basis for lethal force" when "a person in possession of, or suspected to be in possession of, a weapon" does "not obey [an officer's] commands and instead makes some sort of furtive or other threatening movement with the weapon." *Benton v. Layton*, 139 F.4th 281, 290 (4th Cir. 2025) (internal quotation marks omitted). Such conduct "signal[s] to the officer that the suspect intends to use [the weapon] in a way that imminently threatens the safety of the officer or another person." *Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022).

Considering the summary judgment evidence in the light most favorable to Plaintiff, Officer Scott had probable cause to believe that Crosby posed an immediate threat to his safety when he fired his service weapon. Officer Scott had announced himself and, from the doorway of Crosby's bedroom, explained to Crosby that he was with the Sheriff's Office and was there to check on Crosby's welfare in response to a call. After hearing this, Crosby rose from the bed and retrieved a rifle from an open closet near the doorway where Officer Scott stood. Officer Scott then commanded: "Don't! No! No! No! No! No! No! No! No! No! No! No! No! No! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't!" J.A. Digital Media (22:10–22:13). Ignoring those commands, Crosby continued advancing toward Officer Scott, readying the rifle with both hands. A reasonable officer in that situation would have had probable cause to believe that Crosby intended to use the rifle in a way that imminently threatened the officer with physical harm. Accordingly, the use of deadly force was objectively reasonable. "No citizen can fairly expect to draw a gun on police without risking tragic consequences. And

16

no court can expect any human being to remain passive in the face of an active threat on his or her life." *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

The parties dispute whether Crosby pointed the rifle directly at Officer Scott before Officer Scott fired. Viewing the evidence in the light most favorable to Plaintiff, the body-worn camera footage and enhanced photographs are not crystal clear about how high Crosby managed to raise his rifle before he was shot. The evidence unquestionably shows, however, that unlike in the cases on which Plaintiff relies, Crosby was not holding the gun "with the barrel safely pointed towards the ceiling," *Knibbs*, 30 F.4th at 214, or carrying it "in one hand, with its muzzle pointed at the ground," *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013); *see also Pena v. Porter*, 316 Fed. App. 303, 307 (4th Cir. 2009).

Even accepting Plaintiff's position that Crosby did not manage to point his rifle directly at Officer Scott, Officer Scott's use of lethal force was nevertheless objectively reasonable. "This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) (collecting cases). A reasonable officer would perceive Crosby's actions—crossing the room to retrieve a rifle, ignoring commands to stop, and advancing toward the officer while raising the rifle with both hands—as an indication of "immediate intent to harm." *Knibbs*, 30 F.4th at 217; *see Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 585 (4th Cir. 2017) ("If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions."). Indeed, Crosby's "threatening movement[s]" were brazen and just as

17

menacing as the "furtive" movements we have found threatening in other cases, if not more so. *Benton*, 139 F.4th at 290 (internal quotation marks omitted); *see also Craven v. Novelli*, No. 23-1393, 2024 WL 1952590, at *8 (4th Cir. May 3, 2024) (describing cases).

Moreover, Crosby retrieved the rifle *while* he was talking face-to-face with Officer Scott, after being informed that Officer Scott was with the Sheriff's Office and there to perform a welfare check. This scenario is not like that in *Knibbs*, where a reasonable officer on a home's unlit porch after midnight "would have recognized that it was unknown whether [the person inside the home] could discern who was outside on his porch before answering the door." 30 F.4th at 219. Officer Scott stood in Crosby's bedroom doorway wearing his uniform, with the word "Sheriff" on his chest. He repeatedly told Crosby he was with the Sheriff's Office and was there to check on Crosby's welfare. And Crosby's initial responses to Officer Scott—"What can I do for you," "I'm fine," and "What do you want me to do"—suggested that he heard Officer Scott and understood that he was law enforcement, not an intruder. J.A. Digital Media (21:07–22:04). The recorded one-minute conversation between Crosby and Officer Scott belies Plaintiff's assertion of a genuine factual dispute regarding whether a reasonable officer would have thought that Crosby may be unaware that Officer Scott was law enforcement.

The other cases on which Plaintiff relies are also unlike this one in important ways. In *Cooper*, the officers did not announce themselves or issue any commands before they began firing on the plaintiff, who had stepped onto his porch to investigate a nocturnal disturbance while holding a shotgun in one hand with the muzzle pointed toward the ground. 735 F.3d at 155–156, 159–160. That is a far cry from these undisputed facts,

18

where Crosby picked up a rifle mid-conversation with an officer who had identified himself and explained the reason for his presence. Similarly, in *Betton*, the officer broke down the plaintiff's door and, after entering, "shot [the plaintiff], who was holding a firearm 'down,' without first identifying himself as a member of law enforcement or giving any commands to [the plaintiff]." 942 F.3d at 192. And in *Pena*, officers did not identify themselves or give any warning or commands before shooting the plaintiff "almost immediately" after he opened his door carrying a rifle in one hand, pointed down. 316 Fed. App. at 307, 310–311. These scenarios are nothing like the facts here. Crosby retrieved a rifle while talking to an announced law enforcement officer and then, disobeying commands to stop, advanced toward the officer while hoisting the rifle with both hands. In that circumstance, Officer Scott's decision to fire was not unreasonable.

Plaintiff lastly argues that a reasonable officer would have left Crosby's residence after he said he was "fine" and told the officer to "get out of [his] home." Opening Br. 43. Plaintiff appears to be suggesting that Officer Scott created, or at least contributed to, the dangerous situation in which he ultimately found himself, although Plaintiff does not explain how that should factor into the reasonableness analysis. In any event, we disagree with Plaintiff's premise. Officer Scott was aware that Crosby had threatened to harm himself. He had found a pill bottle next to an apparent suicide note, and he had seen a live round of ammunition in the hallway outside Crosby's bedroom. When Officer Scott found Crosby, he was oddly positioned under the bed's fitted sheet, his face red and his speech slurred. In that situation, an officer could have reasonably been skeptical of Crosby's assertion that he was "fine" and could have reasonably sought firmer assurance that Crosby

19

was not at risk of imminent bodily injury. Notably, when asked whether he had "taken any pills or anything like that," Crosby did not answer directly but instead responded, "What do you want me to do?" J.A. Digital Media (21:30–21:40). It was objectively reasonable for Officer Scott to engage Crosby in a minute of conversation to verify that he was safe rather than, as Plaintiff would have it, vacate the premises immediately upon finding Crosby alive. And when Crosby made the tragic decision to retrieve his rifle and advance toward Officer Scott while raising his weapon, it was objectively reasonable for Officer Scott to defend himself with deadly force.

IV.

We turn, as a final matter, to Plaintiff's claim against the Colleton County Sheriff's Office and Sheriff Hill in his official capacity. Plaintiff alleged that the Sheriff's Office failed to train officers how to conduct welfare checks and so was deliberately indifferent to Crosby's Fourth Amendment rights. "[A] municipality is liable under [42 U.S.C.] § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). It follows that "a municipality cannot be held liable under section 1983 for inadequate training where individuals subject to the training program at issue did not violate the plaintiff's constitutional rights." *Howerton v. Fletcher*, 213 F.3d 171, 175 n.5 (4th Cir. 2000). Because Officer Scott did not violate Crosby's Fourth Amendment rights, the Sheriff's Office and Sheriff Hill cannot be liable for failure to train.

20

V.

The district court correctly granted summary judgment in Defendants' favor on all three of Plaintiff's federal claims.  We therefore affirm the judgment of the district court.

*AFFIRMED*

FLOYD, Senior Circuit Judge, dissenting in part:

I would reverse and remand for further proceedings the district court's order granting summary judgment to Colleton County Sheriff's Office (CCSO) Deputy Jacob Scott (Deputy Scott)[1] on the Fourth Amendment excessive force claim brought by the estate of William Jerry Crosby (the "Estate"). There are at least three genuine issues of material fact that impact our analysis of whether Deputy Scott's use of deadly force was constitutionally reasonable. First, under the Estate's evidence, which we are required to credit at this stage, a reasonable officer could understand that Deputy Scott was not readily identifiable to Crosby as a deputy but instead Crosby could have believed an intruder stood at his bedroom door. Second, a jury could believe the Estate's evidence to find that Crosby picked up the snake gun but never pointed it at Deputy Scott in response to the unidentified stranger in his bedroom. Third, a jury could credit the Estate's evidence and find that Deputy Scott did not clearly command Crosby to drop the snake gun. It is my opinion that binding precedent dictates that these disputed facts must be resolved by the jury in the first instance. Since I would reverse the excessive force claim, I would also reverse and remand for further proceedings the Estate's claim against CCSO and Sheriff Guerry Hill (Sheriff Hill) in his official capacity for failure to train CCSO deputies. Because the majority holds otherwise, I respectfully dissent.

---

[1] The majority identifies Deputy Scott as Officer Scott. Police officers typically serve cities and towns, whereas sheriffs' deputies handle law enforcement in counties and unincorporated areas. Deputy Scott was a sheriff's deputy in Colleton County and therefore I abbreviate his name to Deputy Scott rather than following the majority's Officer Scott shorthand.

I.

Because I join the majority in affirming the lower court's grant of summary judgment as to the Estate's claim of unlawful entry, I dispense with recitation of those relevant facts and incorporate, as applicable, the majority's recitation thereof. Although I respect the majority's view of the record, I am unable to join them as to all their recited facts relevant to the excessive force claim, as I understand the record differently. Because this appeal comes to us on cross motions for summary judgment, we view the facts in the light most favorable to the nonmovant, "even if a jury could well believe the evidence forecast by the [moving party]." *Franklin v. City of Charlotte*, 64 F.4th 519, 525 (4th Cir. 2023) (citation modified). With that in mind, I recite the relevant facts as to the excessive force claim, noting where my recitation diverges from the majority's recitation.

On his final entry into the river house, Deputy Scott walked up an exterior staircase and entered the second-floor screened living space past the barking Boykin spaniel. Deputy Scott then entered the interior hallway of the house—unannounced and without knocking—with his gun drawn. At this time, the sun had set and the second floor was mostly dark. Deputy Scott illuminated his path using only a flashlight. As Deputy Scott began searching the floor, he radioed to dispatch, "Clearing the residence, give me the channel." J.A. Digital Media (21:00–21:04).

Deputy Scott proceeded down a dark hallway and announced, "Sheriff's Office." *Id.* (21:09). The bedroom at the end of the hallway was dark with no lights on. From the darkened bedroom, Crosby responded, "What can I do for you?" *Id.* (21:11–21:13).

23

Deputy Scott asked, "Where are you at, man? It's the Sheriff's Office, are you okay?" *Id.* (21:13–21:19). Crosby responded, "I'm fine." *Id.* (21:21–22). Deputy Scott took up a position in the bedroom doorway and trained his flashlight on Crosby, saying, "someone called in about you." *Id.* (21:25–26). Crosby then repeatedly told Deputy Scott, "Get the hell out of my home." *Id.* (21:28–22:05). Deputy Scott refused to leave. Deputy Scott told Crosby, "we gotta check on you," asked Crosby if he had taken any pills and asked him to "come out and talk to me real quick." *Id.* (21:23–22:05). Crosby repeated his demand that Deputy Scott leave his home. Deputy Scott explained he was there for health and welfare and replied, "I'm not going to leave this door, so we just need to go outside and talk, and we can just handle this." *Id.* (21:23–22:05).

Crosby then rose from his bed and walked to a bedroom closet where he kept a "snake gun" that his family used to protect themselves from water moccasins and other river snakes. Deputy Scott took a step back into the hallway, keeping his flashlight beam trained on Crosby in the dark house. Crosby picked up the snake gun from the closet and held it with the muzzle down and, as he did, Deputy Scott repeatedly said, "No! No! No!" and "Don't! Don't! Don't!" *Id.* (22:09–13). Two seconds after Crosby picked up the gun, Deputy Scott open fired on Crosby, shooting him several times. Crosby collapsed on his own bed. It is unclear from the body camera footage whether Crosby ever pointed the

24

muzzle towards Deputy Scott.[2]  EMS transported Crosby to the hospital, where he was pronounced dead.

The district court denied the Estate's motion for summary judgment, granted defendants' motion for summary judgment on each of the Estate's civil rights claims arising under 42 U.S.C. § 1983, and remanded the Estate's state law claims to state court. I would affirm the lower court's resolution of the Estate's Fourth Amendment unlawful entry claim but reverse and remand for further proceedings as to the Estate's excessive force claim against Deputy Scott and as to the Estate's municipal liability, official capacity liability, and *Monell*[3] liability claims brought against CCSO and Sheriff Hill in his official capacity.

II.

This Court reviews *de novo* district court decisions on motions for summary judgment and qualified immunity.  *Caraway v. City of Pineville*, 111 F.4th 369, 378 (4th Cir. 2024).  "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023) (quoting Fed. R.

---

[2] The majority writes that "Crosby picked up the rifle and began raising it with two hands as he stepped toward Officer Scott."  Maj. Op. at 7.  To my eyes, this is not clear from the body camera footage or the record.  The Estate suggests that the video only shows Crosby picking up the snake gun with the muzzle facing down.  On a motion for summary judgment, we must view the facts in the light most favorable to the nonmoving Estate even if a jury would believe movant CCSO Defendants.  *See Franklin*, 64 F.4th at 525.

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

25

Civ. P. 56(a)).  A fact is material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When cross-motions for summary judgment are before us, we "examine[] each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure."  *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021) (citation modified).

## III.

The Estate brings § 1983 claims against Deputy Scott in his individual capacity.[4] But "[l]aw enforcement officers sued in their individual capacities under § 1983 may rely on the doctrine of qualified immunity, which protects government officials from 'bad guesses in gray areas and ensures that they are liable only for transgressing bright lines' in defense of their actions."  *Quinn v. Zerkle*, 111 F.4th 281, 290 (4th Cir. 2024) (quoting *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

---

[4] Section 1983 provides a vehicle for plaintiffs to assert claims against anyone who, under the color of law, subjects them to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.

Qualified immunity is a two-step inquiry "that asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (quoting *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010)). The majority stopped its excessive force analysis after finding that no constitutional violation occurred, without reaching whether the right violated was clearly established. I first assess whether the facts viewed in the light most favorable to the Estate show that Deputy Scott's conduct violated the Fourth Amendment. Next, I assess whether the law was clearly established as to the excessive force claim, such that Deputy Scott is entitled to qualified immunity.

A.

The district court concluded that "[a]t the moment force was employed, Mr. Crosby appeared poised to kill Officer Scott. Mr. Crosby rose out of bed *to retrieve* a firearm, ignored Officer Scott's commands, and pointed a rifle at Officer Scott." *Crosby v. Colleton Cnty. Sheriff's Off.*, No. 2:22-cv-03897, 2023 WL 8934547, at *5 (D.S.C. Dec. 27, 2023). As such, the district court concluded that there was no genuine issue of material fact that Deputy Scott's use of force was constitutionally reasonable under the Fourth Amendment. The majority now affirms the district court's conclusion and analysis. I would reverse.

Our job in reviewing an award of qualified immunity at the summary judgment stage is to consider "whether there are any material disputes of fact . . . that, when resolved, would amount to the violation of a clearly established constitutional right. If there are, summary judgment is inappropriate." *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022).

27

A jury could credit the Estate's evidence—that Deputy Scott was not readily identifiable as a deputy, that Crosby never pointed the muzzle of his gun at Deputy Scott, and that Deputy Scott never clearly commanded Crosby to put down his weapon—to find that a constitutional violation had occurred. Thus, the first prong of the qualified immunity analysis is met.

The alleged constitutional violation at issue concerns Crosby's Fourth Amendment rights. "[A]pprehension by the use of deadly force is a seizure subject to . . . the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "A reasonable officer is entitled to use deadly force where [he] has probable cause to believe that a suspect poses a threat of *serious physical harm*, either to [the officer] or to others." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (citation modified) (emphasis added). To determine whether such probable cause existed here, we ask whether Deputy Scott's use of deadly force was "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [Deputy Scott's] underlying intent or motivation." *See Graham v. Connor*, 490 U.S. 386, 397 (1989). "We assess the reasonableness of his conduct based on the totality of the circumstances . . . , and based on the information available to him immediately prior to and at the very moment they fired the fatal shots." *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 582 (4th Cir. 2017) (citation modified); *Barnes v. Felix*, 605 U.S. 73, 76, 80–83 (2025) (explaining that courts must use the totality of the circumstances in addressing the reasonableness of the officer's actions in evaluating whether an officer's use of deadly force was reasonable under the Fourth Amendment).

Three factors generally inform analysis of whether probable cause existed: (1) "the severity of the crime"; (2) "whether the suspect posed an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest." *Graham*, 490 U.S. at 396. The first and third factors offer limited probative guidance. First, the original reason Deputy Scott was at the river house was for a welfare check, but Crosby's picking up the snake gun is what caused Deputy Scott to fear for his life, and, as such, the severity of the crime is not particularly relevant to the analysis. *See, e.g.*, *Knibbs v. Momphard*, 30 F.4th 200, 215 (4th Cir. 2022). Under the third factor, Deputy Scott was not attempting to arrest Crosby; rather, he was in fact performing a welfare check on him, which favors the Estate. Thus, the second factor is most relevant: whether Crosby posed an immediate threat to Deputy Scott's life.

A holistic review of the record reflects there are at least three genuinely disputed and material facts: (1) whether a reasonable officer would have believed that Crosby believed him to be a law enforcement official based on announcement alone without visual confirmation in the dark bedroom, (2) whether Crosby aimed his gun at Deputy Scott, and (3) whether Deputy Scott clearly commanded Crosby to drop the gun. Accepting the Estate's version of events, as we must at this stage, Deputy Scott shot Crosby inside his own home after Crosby picked up a gun that was not clearly aimed at Deputy Scott, who was debatably recognizable as a law enforcement officer inside Crosby's darkened bedroom and who did not clearly command Crosby to put the weapon down.

First, it is material whether Deputy Scott was readily identifiable as law enforcement because "law enforcement identification certainly can—and often does—play a role in this

29

court's analysis of whether an officer's use of force was objectively reasonable." *Payne v. Moser*, 172 F.4th 408, 417 (4th Cir. 2026). Indeed, summary judgment can be precluded where there is a genuine dispute of material fact as to whether an office was "readily recognizable as a law enforcement officer." *Knibbs*, 30 F.4th at 216–17. Furthermore, an officer's failure to warn or provide direction before using potentially deadly force weighs against them in the *Graham* analysis. *See Payne*, 172 F.4th at 417 (citing *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 825 (9th Cir. 2023)).

On the one hand, it is undisputed that Deputy Scott identified himself as from the Sheriff's Office in the hallway. But the Estate contends that he was hidden in the darkness behind the bright light of his flashlight and he stood blocking the exit. Deputy Scott "was not wearing a traditional police uniform" but instead wore tan pants and a dark shirt and vest that identified him as "Sheriff" on a small patch. Opening Br. at 39. Moreover, the Estate posits that Crosby was unsure "whether the trespasser behind the flashlight was a police officer or a burglar." *Id.* at 40. We cannot ask the decedent whether he understood Deputy Scott to be law enforcement. *Cf. Stanton*, 25 F.4th at 234 (directing courts to take special care in deadly force cases where the officer "has killed the only other potential witness" that can directly refute the deputy's account of what happened). On the other hand, Deputy Scott contends that regardless of any disputed lighting, he had identified himself as law enforcement and that Crosby's response of "what can I do for you?" is the response and tone of a man responding to law enforcement, not an intruder, and no reasonable juror would find otherwise. Resp. Br. at 22 (quoting J.A. Digital Media (21:09–21:24)). In viewing these contradictory conclusions, I am mindful of Rule 56's demand

30

"to avoid simply accepting [Deputy Scott's] self-serving statements and . . . consider *all* contradictory evidence." *Stanton*, 25 F.4th at 234 (emphasis added).

The majority goes beyond adopting movant Deputy Scott's proffered facts—they take it one step further, inaccurately concluding "[Deputy] Scott had announced himself and, from the doorway of Crosby's bedroom, explained to Crosby that he was with the Sheriff's Office and was there to check on Crosby's welfare in response to a call." Maj. Op. at 16. Even accepting the *movant's* generous recitation of facts—which we may not do—this conclusion overstates Crosby and Deputy Scott's interaction. A more accurate recitation is that both parties appear to agree that Deputy Scott clearly announced himself as from Sheriff's Office in the hallway, but he was not clearly visually identifiable as law enforcement due to the dark lighting. "In other words, the record does not conclusively establish that [Crosby] could have visually identified Deputy [Scott] as a law enforcement officer [in his bedroom] that night." *See Knibbs*, 30 F.4th at 217.

The parties therefore disagree as to whether Crosby believed Deputy Scott was law enforcement and whether a reasonable officer would have understood Crosby to believe as much. Deputy Scott asserts that the tone of Crosby's initial responses suggests that he knew Deputy Scott was law enforcement. But to accept that inference would inappropriately view the facts in the movant's favor. In contrast, the Estate suggests that the fact Crosby sought to retrieve his rifle weighs in favor of finding him to be unsure whether Deputy Scott was law enforcement versus a home intruder. Moreover, the time of day, the absence of light in the house, and the fact that Crosby was initially found in bed would allow a jury to conceivably find that Crosby may not have heard, understood, or

31

believed Deputy Scott's identification of himself as a sheriff. It is the factfinder that must ultimately determine whether to believe the former or the latter. "At summary judgment, we do not make credibility determinations." *Payne*, 172 F.4th at 419. The parties' conflicting interpretations weigh in favor of remanding this case for a jury to weigh the credibility of the two interpretations in the first instance.

Second, the positioning of the snake gun is material because it is the only fact under the present record that should have caused a reasonable officer in Deputy Scott's position to fear for his life. *See Knibbs*, 30 F.4th at 221. It is true that this Court "has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Id.* at 222 (quoting *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) (collecting cases)). "But there is a line that our case law has drawn between lawfully possessing a firearm for self-defense in one's own home, and possessing a firearm (or other object) in a manner that objectively threatens an officer's life or the life of another person." *Id.* Indeed, "[o]ur court has long held that 'simply being armed is not grounds for law enforcement to employ deadly force, unless that person makes some sort of furtive or other threatening movement with the weapon.'" *Payne*, 172 F.4th at 418 (quoting *Cooper v. Doyle*, 163 F.4th 64, 81 (4th Cir. 2025)); *see also Byers v. Painter*, 173 F.4th 155, 163 (4th Cir. 2026) ("This Court has made clear that a suspect does not pose an immediate threat justifying the use of deadly force when the suspect merely possessed, or was suspected of possessing, a weapon and did not obey commands given by officers at the scene.").

32

Summary judgment is inappropriate "where a genuine dispute exists as to whether the plaintiff moved in a furtive or threatening manner." *Payne*, 172 F.4th at 418. Viewed in the light most favorable to the non-moving Estate, there is a genuine dispute as to whether Crosby moved in a furtive or threatening manner, such that a jury—not the majority—should resolve the factual dispute.

These contested material facts, when viewed in their totality, closely resemble those of our prior decisions holding that officers used unconstitutionally excessive force when they shot individuals who, although armed, neither pointed their firearms at the officers nor otherwise gave any indication of an immediate intent to inflict harm. *See, e.g., Knibbs*, 30 F.4th at 218; *Cooper*, 735 F.3d at 159; *Hensley*, 876 F.3d at 583; *Betton v. Belue*, 942 F.3d 184, 193 (4th Cir. 2019); *Ruffin v. Davis*, 174 F.4th 414, 419–20 (4th Cir. 2026); *Byers*, 173 F.4th at 163–65; *cf. Morgan v. City of Charlotte*, 180 F.4th 159, 166 (4th Cir. June 29, 2026) (observing that typical deadly force excessive force claims survive summary judgment and reconciling its deviation from that norm by explaining that "the police here resorted to deadly force only after [the decedent] repeatedly raised and fired his gun while defying their orders"). And genuine disputes of material fact exist in assessing whether the movement was furtive or threatening where the parties dispute whether the victim threatened the police officer with a weapon (e.g., by carrying a gun with the muzzle pointed down). *See, e.g.*, *Cooper*, 735 F.3d at 159–60; *Hensley*, 876 F.3d at 583; *Betton*, 942 F.3d at 187–88; *Knibbs*, 30 F.4th at 216–17; *Byers*, 173 F.4th at 163; *Ruffin*, 174 F.4th at 419; *Morgan*, 180 F.4th at 166. To me, the majority's interpretation is curiously out of step with our precedents. For this second reason, the conflicting interpretations weigh in

33

favor of remanding this case for a jury—not the majority—to determine whether Crosby moved in a furtive or threatening manner. *See Payne*, 172 F.4th at 418.

Finally, I find it prudent to address the majority's red herring suggestion that Crosby ignored Deputy Scott's commands. To be sure, we have noted that ignoring a police officer's commands weighs in favor of finding the officer's use of deadly force reasonable. *Cf. Cooper*, 735 F.3d at 159. But we have also cautioned that ignored commands are not dispositive. *See, e.g.*, *Byers*, 173 F.4th at 163 ("This Court has made clear that a suspect does not pose an immediate threat justifying the use of deadly force when the suspect merely possessed, or was suspected of possessing, a weapon and did not obey commands given by officers at the scene."). And the Estate correctly observes that the persuasive merits of those unclear commands are dubious at best if Crosby did not understand the person issuing them to be a police officer. Viewed the light most favorable to the nonmoving Estate, it is unclear what probative value, if any, the majority's careful repackaging of the "ignored commands" has.

In my opinion, there are at least three genuine issues of material fact as to whether Deputy Scott's use of deadly force was constitutionally reasonable that should be resolved by the jury in the first instance. And if the jury credits this evidence, then it could reasonably conclude that Deputy Scott shot Crosby only because he was holding a gun, which is not justified as a matter of law in these circumstances. *See Knibbs*, 30 F.4th at 218. For these reasons, we should reverse and remand the Estate's Fourth Amendment use of deadly force claim for further proceedings.

34

B.

Upon concluding that a jury could find that Deputy Scott violated Crosby's constitutional rights, I turn to the second prong of the qualified immunity analysis. Deputy Scott could still be entitled to qualified immunity if he can show that the constitutional right he violated was not clearly established at the time of his alleged misconduct. *See Knibbs*, 30 F.4th at 223 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (citation modified). The second step of the qualified immunity analysis in Fourth Amendment cases asks "whether every reasonable officer would know that the challenged conduct was *un*-reasonable." *Wells v. Fuentes*, 126 F.4th 882, 891 (4th Cir. 2025). The issue of "whether a right allegedly violated was clearly established . . . at the time of the challenged conduct is always a matter of law for the court [and therefore] always capable of decision at the summary judgment stage." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992). At the time of the shooting, the right violated was clearly established such that Deputy Scott is not entitled to qualified immunity.

The district court found that it would not be clear to a reasonable officer that it would be unlawful to use deadly force against a suspect who "in a heated discussion, retrieves a firearm, ignores an officer's commands to stop, and points the firearm toward the officer." *Crosby*, 2023 WL 8934547, at *9. The majority does not address whether the rights were clearly established. I disagree with the district court's adoption of the movant's facts in its identification of the right at issue. Instead, we must determine whether it was clearly

35

established in May 2022 that an officer may not use deadly force against a homeowner who possesses a firearm inside his own home but does not aim the weapon at the officer or otherwise threaten him with imminent deadly harm. *See Knibbs*, 30 F.4th at 223 (explaining the importance of defining the right with specificity in the Fourth Amendment context).

In April 2022, we decided *Knibbs*, which analyzed a similar set of facts. 30 F.4th 200. The appeal came to the Fourth Circuit on summary judgment whereby the court had to construe the facts in the light most favorable to the nonmoving estate of Knibbs. *Id.* at 212. At the second step of the qualified immunity analysis, we held that the contours of Knibbs' constitutional right—to be free from the use of use deadly force while possessing a firearm inside his own home and investigating a nocturnal disturbance but not aiming the weapon at the officer or otherwise threatening him with imminent deadly harm—was clearly established in April 2018. *Id.* at 223–24. We held that this applies "even after the homeowner hears the officer announce himself—but cannot visually verify that to be true—and ignores commands to drop the weapon." *Id.* at 223; *see also Hensley*, 876 F.3d at 583–85 (holding that "[t]he lawful possession of a firearm by a suspect at his home, without more, [cannot] justify the use of deadly force" and that the officers' failure to warn weighs against them).

*Knibbs* and *Hensley* are sufficiently analogous to this appeal that we can find the excessive force claim to be clearly established such that Deputy Scott is not entitled to qualified immunity. Like in *Knibbs*, there is a genuine dispute as to whether Crosby pointed the gun at Deputy Scott and a genuine dispute as to whether Deputy Scott was

readily identifiable as an officer of the law. Indeed, when properly viewed in the light most favorable to the Estate, the facts of this appeal weigh in favor of finding *Knibbs* to govern. At minimum, the disputed facts are directly relevant to the question of whether Scott violated a clearly established right. As discussed above, a jury could find that Deputy Scott was not readily identifiable as a deputy, Crosby made no threatening or furtive movement with his snake gun, and Deputy Scott failed to give any command or warn Crosby before firing his gun. Our precedents have clearly established that it was unreasonable for Deputy Scott to use deadly force against Crosby under these circumstances. *See Byers*, 173 F.4th at 166–67. The district court erred when it granted Deputy Scott qualified immunity on the excessive force claim and I would reverse.

IV.

The Estate also brings § 1983 claims against CCSO and Sheriff Hill in his official capacity, which we refer to as a *Monell* claim. The district court found that CCSO and Sheriff Hill were entitled to summary judgment on the Estate's *Monell* claim because Crosby was not deprived of any constitutional rights. *Crosby*, 2023 WL 8934547, at *9–10. To be sure, this Court has long held that a municipality cannot be held liable under § 1983 for inadequate training where the individuals subject to the training program at issue did not violate the plaintiff's constitutional rights. *See, e.g.*, *Cox v. County of Prince William*, 249 F.3d 295, 301 (4th Cir. 2001); *Howerton v. Fletcher*, 213 F.3d 171, 175 n.5 (4th Cir. 2000); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998); *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420–21 (4th Cir. 1996); *Temkin v. Frederick Cnty.*

37

*Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991).  But upon concluding that the district court erred in finding no violation of constitutional rights, I would remand this claim for further proceedings so that the district court determines, in the first instance, whether the Estate has created a jury question as to the *Monell* claim.[5]

V.

Because the district court incorrectly found that the Estate had not created a jury question as to whether an objective officer would have viewed Crosby's crossing the bedroom to pick up a gun to be either furtive or threatening, I would reverse and remand for further proceedings.  Given the majority's contrary holding, I respectfully dissent.

---

[5] Federal appellate courts are "court[s] of review, not of first view."  *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005); *see also Holland v. Big River Mins. Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) ("Generally, issues that were not raised in the district court will not be addressed on appeal.").  We should decline to decide whether the district court erred granting summary judgment to CCSO defendants as to the Estate's *Monell* claim and, instead, should remand the question to the district court for initial review.